JULIET Y. OH (SBN 211414)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234; Facsimile: (310) 229-1244
Email: JYO@LNBYB.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>SARAH ZONE, INC.,<br>a California corporation,<br><br>   Debtor and Debtor-in-Possession. | Case No. 2:18-bk-20836-SK<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF TAE HYUN YOO IN SUPPORT OF DEBTOR'S EMERGENCY "FIRST DAY" MOTIONS**<br><br>Date:        [To be set]<br>Time:       [To be set]<br>Courtroom: 1575<br>Location:   255 E. Temple Street<br>              Los Angeles, California |

1

I, Tae Hyun Yoo, hereby declare as follows:

1. I am over 18 years of age. I am the founder and President of Sarah Zone, Inc., a California corporation and the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case (the "<u>Debtor</u>"), and am therefore familiar with the business operations and financial books and records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify as a witness, I could and would competently testify thereto.

2. I have access to the Debtor's books and records. As the founder and President of the Debtor, I am familiar with the history, organization, operations and financial condition of the Debtor. The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents. The statements set forth in this declaration are based upon my own personal knowledge and my review of the Debtor's books and records.

3. I make this declaration in support of the following emergency "first day" motions filed concurrently herewith by the Debtor:

    a. "Debtor's Emergency Motion For Entry Of An Interim Order, Pending A Final Hearing, Authorizing The Debtor To (A) Use Cash Collateral; And (B) Borrow Money From Insider Tae Hyun Yoo On An Administrative Expense Priority Basis" (the "<u>CC/DIP Motion</u>");

    b. "Debtor's Emergency Motion For Authority To (1) Pay Pre-Petition Priority Wages; And (2) Honor Employment And Benefit Policies" (the "<u>Wage Motion</u>"); and

    c. "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant to 11 U.S.C. § 366" (the "<u>Utility Motion</u>").

///

///

///

2

A.     **Background**.

4.     The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on September 17, 2018 (the "Petition Date"). The Debtor is continuing to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.     I founded the Debtor in October, 2004 and have served, and continue to serve, as the President of the Debtor.

6.     The Debtor is a women's apparel wholesaler, which sells on-trend contemporary women's clothing, shoes, accessories, and cosmetics, primarily to its retail affiliates. The Debtor is headquartered in Los Angeles, California, and currently employs 12 non-insider employees.

7.     The Debtor's customer base has historically been comprised entirely of certain retail affiliates of the Debtor. Due to a general industry-wide shift in consumer shopping preferences from in-store to online shopping, and the increased competition arising therefrom, many of the Debtor's affiliate customers have been forced to close its retail locations, which, in turn, has severely and negatively impacted the amount of sales revenue generated by the Debtor. The Debtor generated gross sales revenue of approximately $24 million in 2016, and generated gross sales revenue of approximately $19 million in 2017. As a result of the decline in the Debtor's sales revenue, the Debtor has had insufficient liquidity to meet all of its financial obligations, ultimately resulting in defaults in payments to the Debtor's vendors.

8.     As a result of the Debtor's defaults, many of the Debtor's vendors have initiated collection actions against the Debtor and, more significantly, have declined to provide additional inventory to the Debtor, thereby cutting off the Debtor's ability to conduct its wholesale apparel business in an optimal manner. In order to obtain "breathing room" from its creditors and have an opportunity to restructure its business and financial affairs and ultimately reorganize, the Debtor filed this Chapter 11 bankruptcy case.

9.     I believe that the filing of a bankruptcy case presented the only viable way for the Debtor to survive and restructure its financial affairs. Through its bankruptcy case, the Debtor

intends to identify and implement reasonable cost cutting measures to streamline its business operations, address and improve the Debtor's relationships with its current vendors and solicit business from new vendors to obtain additional merchandise, which in turn will facilitate an increase in the Debtor's sales revenue, and identify and implement a strategy to expand its customer base, all of which the Debtor believes will enable it to formulate and pursue confirmation of a plan of reorganization which allows the Debtor to restructure its existing debt in a cohesive and efficient manner while continuing to operate its longstanding business.

**B.    The Cash Collateral/Post-Petition Financing Motion (the "CC/DIP Motion")[1].**

10.    The Debtor's primary assets are as follows:

a.    <u>Cash</u>.    As of the Petition Date, the Debtor had cash on hand of approximately $5,000.

b.    <u>Inventory</u>.    As of the Petition Date, the Debtor had inventory with an estimated cost value of approximately $35,000.

c.    <u>Accounts Receivable</u>.    As of the Petition Date, the Debtor had accounts receivable with a face value of approximately $3,650,000.

d.    <u>Other Assets</u>.    As of the Petition Date, the Debtor had office furniture, equipment and fixtures with an estimated liquidation value of $53,690, plus a forklift truck and other vehicles with estimated equity in the aggregate sum of $60,000.

11.    The Debtor's senior secured lender is Open Bank. The Debtor is a borrower under two (2) separate loans with Open Bank, as described below. True and correct copies of the pre-petition loan and collateral documents with Open Bank are attached as **Exhibit "B"** hereto. In addition, a summary of the financing statements recorded against the Debtor by Open Bank is set forth in the Declaration of Juliet Y. Oh (the "<u>Oh Declaration</u>") filed concurrently herewith, with copies of the financing statements attached as Exhibit "1" thereto.

a.    The Debtor is one of multiple borrowers under a loan bearing the Loan Number 33160288 with Open Bank (the "<u>First Loan</u>"), pursuant to a Business Loan

---

[1] All terms not specifically defined herein shall have the meanings ascribed to them in the CC/DIP Motion.

Agreement dated December 23, 2016 among the Debtor, certain non-debtor affiliates of the Debtor, including S&Y Central, LLC ("S&Y"), and Open Bank. My wife, Susan Yoo, and I are the equity holders of S&Y. To the best of my knowledge, the Debtor is currently indebted to Open Bank in the amount of approximately $1,600,000 under the First Loan. Open Bank filed a UCC-1 financing statement against the Debtor asserting a lien against substantially all of the assets of the Debtor to secure the Debtor's obligations under the First Loan. In addition, the First Loan is also secured by assets owned by the Debtor's affiliates who are named as borrowers under the First Loan, including, without limitation, a commercial building owned S&Y located at 655 East 30th Street, Los Angeles, California 90011 (the "Building"). Based upon my knowledge of the Building and the real estate market in which the Building is located, and based upon discussions I have had with the real estate broker for S&Y, I believe the Building has a fair market value between $8.7–9.8 million. The Building is currently listed for sale for $9.8 million. There is only one deed of trust recorded against the Building (by Wells Fargo Bank, securing indebtedness of approximately $2,070,000) which is senior to the deed of trust recorded by Open Bank. Therefore, I believe there is substantial equity in the Building (in excess of $6 million) to further secure the Debtor's obligations under the First Loan to Open Bank.

b. The Debtor is the borrower under a second loan with Open Bank bearing the Loan Number 33170703 (the "Second Loan," and together with the First Loan, the "Bank Loans"), pursuant to a Business Loan Agreement dated October 6, 2017 between the Debtor and the Bank. To the best of my knowledge, the Debtor is currently indebted to Open Bank in the amount of approximately $1,500,000 under the Second Loan. Open Bank filed a UCC-1 financing statement against the Debtor asserting a lien against substantially all of the assets of the Debtor to secure the Debtor's obligations under the Second Loan. The Second Loan is also secured by the Building owned by S&Y (who is a guarantor of the Second Loan). As noted above, I believe there is substantial equity in the

1  Building (in excess of $6 million) to further secure the Debtor's obligations under the
2  Second Loan to Open Bank.

3  12. Prior to the Petition Date, my wife, Susan Yoo, and I provided a loan to the Debtor,
4  in the total sum of $350,000, which loan is secured by substantially all of the Debtor's assets. True
5  and correct copies of the documents evidencing our pre-petition loan to the Debtor are attached as
6  **Exhibit "C"** hereto. My wife and I filed a UCC-1 financing statement asserting a lien against
7  substantially all of the assets of the Debtor, which financing statement is included in Exhibit "1" to
8  the Oh Declaration filed concurrently herewith.

9  13. Prior to the Petition Date, in August, 2018, the Debtor obtained a loan from an
10 individual named Chong Taek Lee ("Lee"), in the amount of $10,000, which loan is secured by
11 substantially all of the Debtor's assets. True and correct copies of the pre-petition loan documents
12 with Lee are attached as **Exhibit "D"** hereto. Lee filed a UCC-1 financing statement asserting a
13 lien against substantially all of the assets of the Debtor, which financing statement is included in
14 Exhibit "1" to the Oh Declaration filed concurrently herewith.

15 14. Based on the foregoing, I believe that Open Bank, Lee, and my wife and I
16 (collectively, the "Secured Parties") are the only parties that have a perfected security interest in
17 the Debtor's cash.

18 15. I am not aware of any other liens that have been asserted against the Debtor's cash,
19 inventory, accounts receivable, and owned office furniture, equipment, furniture, fixtures, and
20 vehicles.

21 16. I believe that, in addition to the secured debts described above, the Debtor has a
22 total of approximately $3,800,000 of unsecured debt.

23 17. By the CC/DIP Motion, the Debtor seeks an order of the Court authorizing the
24 Debtor to use its cash collateral, through and including January 5, 2019, to pay the operating
25 expenses set forth in the proposed budget attached as **Exhibit "A"** hereto, as well as all quarterly
26 fees owing to the Office of the United States Trustee and all expenses owing to the Clerk of the
27 Bankruptcy Court. In addition, to provide the Debtor with reasonable flexibility in the event that
28

sales (and correspondingly, operating expenses) are higher than projected or delayed, the Debtor seeks authority to deviate from the line items contained in the Budget, without the need for any further Court order, by up to 20%, on both a line item and aggregate basis, with any unused portions to be carried over into the following week(s).  The Debtor will not deviate from the Budget beyond the foregoing parameters without further order of the Court.

18.    As reflected in the Budget, I estimate that the Debtor will generate revenue of approximately $30,000 through the end of September, 2018, and then approximately $250,000 per month thereafter.  I believe that the Debtor must be able to use its revenue, in accordance with the Budget, to pay all of the Debtor's normal and ordinary operating expenses (such as payroll, rent, utilities, and insurance) as they come due in the ordinary course of its business and to purchase new inventory to replenish merchandise that is sold to the Debtor's customers, which in turn will facilitate the continued operation of the Debtor's business and the preservation and maximization of the going-concern value of the Debtor's business and assets.  If the Debtor does not obtain authority to use its cash collateral, I believe that the Debtor's estate will suffer immediate and irreparable harm, including, without limitation, a cessation of the Debtor's business operations and a corresponding (and likely substantial) decline in the value of the Debtor's business and assets. Based on the foregoing, I believe that the Debtor's use of cash collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors in this case.

19.    Due to the Debtor's limited availability of cash and inventory at this time and anticipated operations level during the first few months of the Debtor's bankruptcy case, the revenue expected to be generated from the operation of the Debtor's business is insufficient to cover all of the operating expenses set forth in the Budget during the next approximately three (3) months.  Specifically, I estimate that the Debtor will require post-petition financing in the aggregate sum of approximately $350,000 during the months of September, October, November, and December, 2018 to cover operating shortfalls during those months.

1   20.    I have agreed to advance the sums necessary, on an unsecured, administrative
2   expense priority basis, to cover any operating shortfalls reflected in the Budget. Accordingly, by
3   the Motion, the Debtor is also seeking Court approval of the proposed financing from me.

4   21.    My wife, Susan Yoo, and I consent to the Debtor's use of cash collateral to pay the
5   expenses set forth in the Budget in accordance with the terms and conditions set forth in the
6   CC/DIP Motion.

7   22.    Based on the current estimated aggregate value of the Debtor's assets (including the
8   Debtor's cash, inventory, accounts receivable, and other assets), which I believe is approximately
9   $3,803,690 as of the Petition Date, I believe that Open Bank and Lee are adequately protected by
10  an equity cushion of more than 20% in the Debtor's assets.

11  23.    In addition, as further adequate protection of the Debtor's use of cash collateral, the
12  Debtor is proposing in the CC/DIP Motion that the Secured Parties be granted replacement liens
13  and security interests against the Debtor's post-petition assets, to the extent of any diminution in
14  value of such Secured Parties' interests in the Debtor's pre-petition collateral, with such
15  replacement liens to have the same extent, validity, and priority as the pre-petition liens held by
16  such Secured Parties.

**C.    The Wage Motion.**

18  24.    As of the Petition Date, the Debtor employed a total of twelve (12) non-insider
19  employees (collectively, the "Employees," and each, an "Employee"). A list of the Employees
20  which reflects their respective wages is attached as **Exhibit "E"** hereto.

21  25.    Four (4) of the Employees are salaried and are paid on a semi-monthly basis (*i.e.*,
22  on the 15th and last day of each month). The remaining eight (8) Employees are hourly
23  employees and are paid on a bi-weekly basis (*i.e.*, every two weeks, on Friday). While the
24  salaried Employees who are paid on a semi-monthly basis are paid on a current basis through the
25  date of payroll, the hourly Employees who are paid on a bi-weekly basis are paid approximately
26  five (5) days in arrears. So, for example, the payroll paid to salaried Employees on September
27  15, 2018 (immediately prior to the commencement of the Debtor's bankruptcy case) covered the
28

period from September 1–15, 2018, while the payroll paid to hourly Employees on September 7, 2018 covered the period from August 20, 2018–September 2, 2018.

26. The Debtor processes the payment of wages, including all applicable federal and state withholding taxes and payroll taxes (collectively, "Wages"), to its Employees internally, using a payroll software program, and does not use any outside payroll service.

27. On Friday, September 21, 2018, the Debtor will owe Wages to its hourly Employees for the two-week period from September 3–16, 2018 – all fourteen (14) days of which will constitute pre-petition obligations. The Debtor estimates that the total payroll obligations due on Friday, September 21, 2018, including all payroll taxes, will be approximately $8,460.00. To ensure that there is no interruption or delay in the payment of Wages to the hourly Employees who are paid on a bi-weekly basis, the Debtor must obtain Court approval of the Wage Motion by Thursday, September 20, 2018.

28. On Sunday, September 30, 2018, the Debtor will owe Wages to its salaried Employees for the period from September 15–30, 2018 – two (2) days of which will constitute pre-petition obligations. The Debtor estimates that the total payroll obligations due on Sunday, September 30, 2018, including all payroll taxes, will be approximately $4,903.50.

29. The Debtor is *not* seeking authority to pay the pre-petition priority Wages of any employees who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code. The Employees who are the subject of this Motion do not include any "insider" employees of the Debtor. Approval to pay compensation to the Debtor's "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

30. The Debtor also provides the Employees with certain employment and benefit programs which I believe are comparable to the programs that are typically offered by other employers within the wholesale apparel industry. The following employment and benefit programs are proposed to be continued to be offered to the Debtor's Employees post-petition:

9

Case 2:18-bk-20836-SK    Doc 7    Filed 09/17/18    Entered 09/17/18 15:03:43    Desc
Main Document    Page 10 of 12

      a.    ***Paid Time Off (PTO) Policy***. The Debtor offers a paid time off policy to its Employees. All Employees accrue a total of 48 hours (*e.g.*, six 8-hour days) of paid time off per calendar year. Unused paid time off during a calendar year is not carried forward into the following calendar year(s). Employees are not permitted to "cash out" any accrued and unused paid time off. The Debtor desires to continue having its existing paid time off policy in effect, and seeks authority to honor such policy post-petition as set forth above.

      b.    ***Employee Medical Insurance Policy***. Those Employees who work full-time (*i.e.* more than 30 hours per week) are eligible to receive company-subsidized medical insurance coverage. The Debtor subsidizes approximately 75% of the premiums for medical insurance coverage for eligible Employees. The Debtor desires to continue having its employee medical insurance policy in effect and therefore, seeks authority to continue to honor such policy post-petition.

31.    All of the Employees included in the list attached as Exhibit "E" hereto are still employed by the Debtor.

32.    I believe that significantly all of the Employees will quit if they are not provided their Wages and benefits in full in a timely fashion. I believe this is particularly true for those Employees who work on an hourly basis, who would have little incentive to continue working for the Debtor and could very easily acquire new employment elsewhere. I believe it is crucial for the Debtor to retain its Employees to continue its business operations without interruption and to preserve and maximize the value of its assets during this Chapter 11 case. The Debtor's personnel are familiar with the Debtor's wholesale apparel operations and therefore are essential to the preservation of the Debtor's business. The Debtor's failure to pay pre-petition Wages to the Employees and to continue to honor the Debtor's employment and benefit policies will likely result in severe disruptions to the Debtor's operations to the detriment of creditors. Thus, I believe that the Debtor's ability to preserve the full value of its business and assets depends upon the Debtor's continued operations, which cannot occur without the efforts of the Employees.

33. In order to attract and retain the Employees, the Debtor maintains what I believe are competitive and reasonable employment and benefit policies. I believe that maintaining good relationships with, and the morale of, the Employees requires continuing to honor the employment and benefit policies described above and in the Wage Motion which are currently in effect for the Employees.

34. All of the Employees' claims for pre-petition Wages are within the $12,850 limit which I am informed is established by the Bankruptcy Code.

35. The source of the funds to be used to pay and/or honor the pre-petition Wages and to continue honoring the Debtor's employment and benefit policies will be the Debtor's revenue, which I believe Open Bank contends constitutes its cash collateral. Accordingly, concurrently herewith, the Debtor has filed the CC/DIP Motion seeking the entry of an order authorizing the Debtor to use cash collateral, plus the proceeds of unsecured post-petition financing proposed to be provided by me, to allow the Debtor to maintain its business operations and preserve the value of the Debtor's assets. Based on the operating budget submitted in connection with the CC/DIP Motion, I do not believe that approval to pay and/or honor the Employees' Wages will render the Debtor's bankruptcy estate administratively insolvent.

**D.    The Utility Motion.**

36. The Debtor conducts its business from its corporate office and warehouse facility located at 655 East 30th Street, Los Angeles, California 90011 (the "Facility"), which the Debtor rents from its affiliate, S&Y.

37. In connection with the operation of the Debtor's business, the Debtor receives water, electricity, telephone, internet, waste disposal and/or similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies"). Given the importance of the services provided by the Utility Companies to the continued operation of the Debtor's business, I believe it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services at the Debtor's Facility be determined promptly so that there is no interruption in the services provided.

38. Attached as **Exhibit "F"** hereto is a list which sets forth the name and address of each Utility Company that is currently providing utility services to the Debtor's Facility, the type of utility service provided by each Utility Company, the account number(s) associated with each Utility Company, and the amount of the cash deposit proposed to be paid to each Utility Company as adequate assurance of payment (collectively, the "Cash Deposits," and individually, a "Cash Deposit"). The Debtor requests authority to pay the proposed Cash Deposits to the Utility Companies for the utility accounts reflected in Exhibit "F" hereto.

39. The total aggregate amount of the Cash Deposits proposed to be paid by the Debtor to the Utility Companies is approximately $3,661.15. Generally, the Debtor is proposing to provide each Utility Company with a Cash Deposit an amount equal to the average monthly payment based on payments historically made on the utility account(s) (as determined by the last three monthly or bi-monthly payments made on such utility accounts).

40. In addition to the Cash Deposits, the Utility Companies will be kept current on all post-petition amounts payable to such Utility Companies.

41. The source of the funds to be used to pay the proposed Cash Deposits to the Utility Companies will be the Debtor's revenue, which I believe Open Bank contends constitutes its cash collateral. Accordingly, concurrently herewith, the Debtor has filed the CC/DIP Motion seeking the entry of an order authorizing the Debtor to use cash collateral, plus the proceeds of unsecured post-petition financing proposed to be provided by me, to allow the Debtor to maintain its business operations and preserve the value of the Debtor's assets. Based on the operating budget submitted in connection with the Debtor's CC/DIP Motion, approval to pay the Cash Deposits to the Utility Companies will not render the Debtor's bankruptcy estate administratively insolvent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of September, 2018 at Los Angeles, California.

_____
TAE HYUN YOO